IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER AUTHORIZING THE TRACKING OF CELLULAR TELEPHONE (417) 496-0575, INCLUDING CELL SITE, TRIANGULATION, AND GPS. | No.<br><br>(UNDER SEAL) |

**EXHIBIT "A"**
**AFFIDAVIT IN SUPPORT OF APPLICATION**

I, Jason R. Carter, a Task Force Officer (TFO) of the United States Drug Enforcement Administration (DEA), being duly sworn, do depose and state that:

1. I am employed as a TFO with the DEA, assigned to the Springfield, Missouri, Resident Office. As such, I am an investigative and federal law enforcement officer of the United States of America, authorized to conduct investigations of, and to make arrests and seizures for, offenses enumerated in the Controlled Substances Act, Title 21, United States Code.

2. I have been a sworn law enforcement officer for over six years. I have received specialized training relating to the manufacture, distribution, and possession with intent to distribute controlled substances. From my training and experience, I have extensive knowledge of complex illegal drug manufacturing and distribution operations.

3. I submit this affidavit in support of the attached application for an order authorizing the tracking of cellular telephone (417) 496-0575, to include GPS location, cell-site location information, triangulation, and the disclosure of location-based data. I set forth the following facts showing that there are sufficient grounds to believe that the GPS location, cell-site and other subscriber records, and information pertaining to telephone number (417) 496-0575

(hereinafter the Target Telephone) will likely be relevant and material to an ongoing criminal investigation.

4. The information contained in this affidavit is based upon my personal knowledge and investigation, as well as information provided to me by other law enforcement agents involved in the investigation of this case. This affidavit contains the facts necessary to establish probable cause to track the Target Telephone. Not all of the facts known to me about this investigation have been included.

5. As outlined below, my investigation has uncovered that the Target Telephone is a Sprint Corporation cellular telephone number registered to a subscriber named Leland COURTNEY, but is associated with the Facebook profile of William JONES and is being used by JONES.

6. On June 1, 2016, I responded to the Polk County, Missouri, Jail to conduct an interview of a known, confidential informant (CI). The CI had previously been the target of a narcotics investigation conducted by Detective Benjamin Lord of the Narcotics Enforcement Team (NET) of the Springfield, Missouri, Police Department (SPD). Detective Lord executed a warrant on the home of the CI and seized approximately one-half pound of methamphetamine. The CI has provided information during the course of this investigation that has been proven reliable and has been confirmed through surveillance, Facebook searches, other police investigation, jail records, and administrative subpoenas.

7. During the jail interview, the CI identified Crystal BURDETTE as his or her source of methamphetamine supply. The CI stated that BURDETTE was selling significant amounts of methamphetamine, cocaine, and marijuana in the Springfield, Missouri, area. The CI provided BURDETTE's cellular telephone number as (417) 770-8727. An open source Facebook search confirmed that phone number as one utilized by BURDETTE. I was able to identify the profile

2

associated with the number as BURDETTE's through the name and profile picture, which pictured BURDETTE, who I was familiar with through surveillance and viewing her Missouri Department of Revenue driver's license photograph.

8. The CI stated that during the week of April 28, 2016, he or she had provided BURDETTE with a ride to the Harbor Freight Tools store, located at 3909 South Campbell Avenue, Springfield, Greene County, Missouri. Upon their arrival at the store, the CI exited the vehicle, and BURDETTE took the vehicle to meet her source of cocaine supply. The CI did not see where BURDETTE took the vehicle, but saw her travel west on Westview Street. Due to BURDETTE's direction of travel, and the short amount of time she was gone, the CI believed BURDETTE had driven behind the business or to a residence in the immediate area. When BURDETTE returned a short time later, the CI observed her to be in possession of a kilogram of cocaine. Based on BURDETTE's statements, and a phone conversation between BURDETTE and her source of supply overheard by the CI, the CI knew she had paid $30,000.00 in U.S. currency for the kilogram of cocaine. The CI also stated he or she believed the male BURDETTE met with was possibly a male named Willy.

9. The CI had met Willy before and described Willy as BURDETTE's partner in the drug trade. The CI described Willy as a white male in his forties with noticeable acne scarring on his face. The CI also stated he knew Willy had recently been released from the Missouri Department of Corrections. Using that information, I was able to identify Willy as JONES.

10. JONES has criminal convictions for stealing, forgery, possession of a controlled substance, possession of ephedrine, possession of methamphetamine paraphernalia, stealing a motor vehicle, creating or altering a chemical to a controlled substance, criminal non-support of a child, and second degree assault.

11. I submitted an administrative subpoena to the Verizon Wireless Corporation for the subscriber information and phone tolls for April 1, 2016, to May 15, 2016, for phone number (417) 770-8727, the number utilized by Crystal BURDETTE at the time the CI drove her to purchase cocaine from "Willy" and the number provided to me by the CI for BURDETTE when I first spoke to him or her. I did this on December 8, 2016. On December 12, 2016, Verizon Wireless responded to the subpoena, identifying the account holder as Tracfone Wireless. An analysis of phone tolls showed that number was in contact with a phone number, identified by using a Facebook search as one previously utilized by JONES, ((417) 848-5975) fifteen times during the time period of April 25, 2016, to April 29, 2016, which was the time frame of the aforementioned cocaine deal between BURDETTE and JONES.

12. On June 6, 2016, I responded to the United Parcel Service (UPS) Store located at 334 East Kearney Street, Springfield, Greene County, Missouri, after receiving a phone call about a suspicious package at that location. Store personnel reported a suspicious male had arrived with a package for overnight shipment to an address in California. He claimed the package contained "auto manuals." The store personnel stated the male exhibited behaviors and an appearance of one under the influence of a controlled substance. The suspicious male verbally identified himself as James Cook, and provided a return address for the package of 1958 State Highway KK, Pleasant Hope, Missouri. From my investigation into Crystal BURDETTE, I knew that address to be her residence.

13. Based on the numerous indicators of suspicious activity, the UPS Security Supervisor chose to open the package per UPS policy to ensure its contents were safe for shipment. Upon opening the package, the UPS personnel recovered a large bag containing a white, powdery substance consistent with cocaine and a large sum of U.S. currency. DEA Special Agent (SA) Timothy

4

Krisik seized the white powder and currency at that time. I later field tested the white powder, and the test showed a positive result for the presence of cocaine. The U.S. currency was later officially counted, and was found to total $34,920.

14. On August 2, 2016, the CI contacted me to provide information about recent drug activity conducted by BURDETTE. During that conversation, the CI reported he/she had just spent approximately two hours with BURDETTE at her home. During their visit, BURDETTE told the CI that COOK had been staying in her trailer at 1958 State Highway KK, Pleasant Hope, Missouri. He had been the sender of the aforementioned package seized by SA Krisik, and had done so at the instruction of BURDETTE. When BURDETTE learned of the package's seizure by police, and that COOK had used his real name and her real address, she became very angry. She forced COOK from her trailer and told JONES about the seizure. JONES tried to convince BURDETTE they needed to kill COOK as punishment for the incident and to prevent him from speaking to police. BURDETTE was able to convince JONES that doing so would only bring them more trouble. Additionally, the CI reported many of those associated with BURDETTE and JONES, including BURDETTE and JONES, changed their phone numbers after the interception of the package in an attempt to avoid police detection. Their numbers were replaced, and BURDETTE refused to share her new phone number with the CI at that time.

15. I continued my investigation into JONES and a search of open source Facebook profiles revealed JONES was an associate of Robert and Leland COURTNEY. Past SPD police reports revealed Robert COURTNEY had an address of 2830 West Swan Street, Springfield, Missouri.

16. On November 1, 2016, SPD NET Detective Brandon Bowling and I conducted surveillance of 2830 West Swan, Springfield, Missouri. A black in color 1997 Ford F-350, bearing Missouri

5

license plates 5YN 254, was parked in the driveway. A check of those license plates found they were registered to that vehicle in the name of Leland COURTNEY at 44 Goss Lane, Fair Grove, Missouri. There was also a black in color 1999 Chevrolet Blazer parked in the driveway. The Blazer was not displaying a license plate at that time.

17. At approximately 9:00 p.m. that same day, the black in color Chevrolet Blazer left the address. I contacted SPD Officer James Dougherty, and requested he conduct a traffic stop of the vehicle for the license plate violation. Officer Dougherty conducted the traffic stop near the intersection of Scenic Avenue and Walnut Lawn, Springfield, Missouri. He contacted the driver, who identified herself as Morgan ROBERTS. Officer Dougherty could smell a faint odor of marijuana emanating from the vehicle. During a probable cause search of the vehicle based on the odor of marijuana, Officer Dougherty located a small amount of suspected marijuana and a small amount of suspected methamphetamine in the center console of the vehicle. ROBERTS was arrested for outstanding misdemeanor warrants and was transported to SPD's South District Station.

18. Detective Bowling and I contacted ROBERTS at that location, and I advised ROBERTS of her *Miranda* rights. ROBERTS said that she lived at 2830 West Swan Street, with her roommate, Robert COURTNEY. ROBERTS said Robert COURTNEY worked for his father's trucking company in Fair Grove, Missouri. ROBERTS had seen Robert COURTNEY with ounces of methamphetamine and had identified his source as Willy, and provided a description consistent with JONES. ROBERTS went on to say she had heard Robert COURTNEY bragging about having pounds of cocaine concealed in oil drums, and believed he was talking about oil drums located at the trucking company.

19. Further investigation into the trucking company identified by ROBERTS revealed it was owned by Leland COURTNEY, Robert's father, and was located at 44 Goss Lane, Fair Grove, Missouri. That address was the registered address for the black F-350 at Robert COURTNEY's house. A check of police resources also showed it was listed as a past address for JONES.

20. In October 2016, the CI again contacted me and reported he/she was able to obtain BURDETTE's new phone number, identifying it as (417) 877-6852. On November 28, 2016, I submitted an administrative subpoena to the Verizon Wireless Corporation requesting the subscriber information and recent phone tolls for that phone number. Verizon Wireless responded on November 30, 2016, and identified the account holder as Crystal GOTT with an address of 1958 State Highway KK, Pleasant Hope, Missouri. Through investigation and Facebook, I had previously determined that GOTT was the last name of BURDETTE's live-in boyfriend, Travis GOTT. During an analysis of the phone tolls, BURDETTE's phone was found to be in frequent contact with the Target Telephone.

21. I used the search function in Facebook to look for a profile associated with the Target Telephone. The search revealed that the Target Telephone is associated with the profile of William JONES. The name on the profile is Willy Jones and I recognized JONES' profile photo from previously viewing a Department of Corrections photograph of him.

22. On November 30, 2016, I submitted an administrative subpoena to the Sprint Corporation requesting subscriber information and phone tolls for the Target Telephone. On December 1, 2016, the Sprint Corporation responded, and identified the account holder as Leland COURTNEY with an address of 44 Goss Lane, Fair Grove, Missouri. An analysis of the

Target Telephone's tolls showed it was in frequent contact with another number registered to Leland COURTNEY, which is associated with Leland COURTNEY's Facebook profile.

23. Based on Leland COURTNEY's possible involvement in the drug trade of JONES, I began investigating him as well. A past SPD report listed Leland COURTNEY as a business owner in a past commercial burglary attempt from October 2011. In that report, Leland COURTNEY reported his son, Robert COURTNEY, had found an attempted forced entry at his place of business, located at 3863 South Campbell Avenue, Springfield, Missouri. Leland COURTNEY had identified himself as the owner of the shopping center complex at that location. That shopping center houses Harbor Freight Tools, which is the location the CI had reported as the location of the cocaine deal conducted by BURDETTE and JONES in April 2016.

24. On December 19, 2016, I sent an administrative subpoena to the Sprint Corporation and received records back that same day showing that that the Target Telephone was still active and was still in contact every few days with the phone number identified as BURDETTE's.

25. Those same records also indicated phone number (417) 234-8887 had been in contact with the Target Telephone more than one hundred times from December 1, 2016, to December 19, 2016. A search of that phone number in Facebook's search function revealed that number was associated with a Facebook profile in the name of Nathaniel EISENHOUR. I am familiar with EISENHOUR from past investigations, and recognized the profile photo associated with that account as a photo of EISENHOUR.

26. From my past experience with EISENHOUR, I know him to have a history of drug use, burglary, and vehicle theft.

27. I also learned EISENHOUR had an active felony parole violation warrant out of the State of Missouri for absconding. I contacted SPD's Special Investigations Unit (SIU) Detectives, and request they contact me if they arrested EISENHOUR on that warrant. On December 21, 2016, I was contacted by SIU Detective Adam Rowles, and he advised he had located EISENHOUR at a local hotel and EISENHOUR had $1,600 in United States currency on him. I responded to that location and contacted EISENHOUR. I identified myself to him, and advised him of his *Miranda* rights. EISENHOUR stated he understood his rights, and agreed to speak to me without a lawyer present. I asked EISENHOUR generic, non-specific questions about his involvement in the drug trade, and he denied selling drugs. He was arrested for his warrant, and was transported to the Greene County, Missouri, Jail.

28. After he was arrested, I requested copies of EISENHOUR's calls from Greene County Jail Corporal Willie Carroll. On January 9, 2017, I received those call recordings in a digital format. I began reviewing the calls, and found a majority of them involved conversation about drug activity using vague or coded language.

29. In my training and experience, I have learned that those involved in the drug trade often use vague and coded language while talking on the phone in an attempt to conceal their drug activity should law enforcement hear the conversation. One example of those conversations was a Greene County Jail call from EISENHOUR to Joshua PRUETT. EISENHOUR talked about PRUETT collecting money owed to EISENHOUR for drug debts. He also said, "I need to know what's up with Willy and those," "that's 65 apiece," and "he got three." Based on my later investigation and a later call between EISENHOUR and the Target Telephone, I believe that Willy is JONES. Based on my training and experience, I also believe the conversation above meant that EISENHOUR believed that JONES had purchased three pounds of

9

methamphetamine from EISENHOUR for $6,500 per pound, which was consistent with the current market value of pounds of methamphetamine.

30. In addition to the price per pound in the conversation being consistent with methamphetamine, I had also located a mid-December 2016 SPD report in which Taylor Stenquist reported that EISENHOUR had been at her apartment and was in possession of a money counter and a large bag of what she believed to be methamphetamine. I have listened to several jail calls between Stenquist and EISENHOUR, and their conversation indicates they are in some sort of romantic relationship.

31. EISENHOUR was transferred to the Missouri Department of Corrections (DOC) facility in Fulton, Missouri, in late December 2016, so I requested copies of his phone calls at that facility as well.

32. On January 19, 2017, I received those phone calls in a digital format. I began reviewing those calls, and I heard several more conversations pertaining to drug activity. An early conversation from shortly after he arrived at DOC revealed that EISENHOUR had contacted his mother, Rhonda SMITH, in order to get a phone number for "Dude."

33. SMITH provided the number as EISENHOUR requested. The next conversation recorded was also between EISENHOUR and SMITH. EISENHOUR told SMITH that the number is no longer good, and requested she contact "Eduardo" on his Facebook account to advise him, "everything is okay" and to request Eduardo's new number. EISENHOUR told SMITH, "That's money right there." Later calls revealed that "Eduardo" or "Dude" was EISENHOUR's source of supply (SOS) for methamphetamine.

34. On January 1, 2017, at 9:13 a.m., EISENHOUR and PRUETT discussed money that was supposed to be collected from JONES. EISENHOUR said he thought PRUETT had "14

10

stacks" from JONES. PRUETT told him he had it, but it was not from JONES. EISENHOUR said, "So you have $14,000 to give to my Grandpa?" PRUETT confirmed he had the money, but again said it was not from JONES. EISENHOUR said, "If Willy got two and a half, he owes more than that." PRUETT replied, "No, I got the big side."

35. Using more vague language, they discussed that PRUETT and JONES split a load of methamphetamine, and PRUETT received a larger portion than JONES. EISENHOUR explained he thought it was supposed to go the other way around.

36. PRUETT then tried to explain to EISENHOUR what JONES wanted to do regarding EISENHOUR's SOS. EISENHOUR cut PRUETT off and told him he did not want to let JONES deal directly with the SOS if EISENHOUR was only going to be incarcerated for a short time, because that would effectively cut him out of any future deals after his release.

37. On January 1, 2017, at 7:39 p.m. EISENHOUR's prison phone account contacted the Target Telephone, and I recognized EISENHOUR's voice as he spoke to a male EISENHOUR referred to as "Willy," who based on my investigation, I believe to be JONES. During that conversation, JONES stated he had "done a little investigating" and asked EISENHOUR if "Chop" was "your guy's name?" EISENHOUR told him no, and said it is "Eduardo." They refer to "Eduardo" as "Dude" several times throughout the conversation. The two also discussed an active federal drug investigation in the Monett and Carthage areas of Missouri. JONES and EISENHOUR then discussed if that investigation was related to "Dude," and their concerns about EISENHOUR possibly being involved in a federal investigation.

38. EISENHOUR asked JONES if he was trying to get "Dude's" number. JONES said he wanted to talk to EISENHOUR first, but had planned on trying to contact "Dude" if EISENHOUR was going to be incarcerated for any significant length of time. EISENHOUR told JONES he

11

was only being held on a parole violation, and expected to be released within a few months. EISENHOUR told JONES to wait until EISENHOUR spoke to his parole officer so he could find out how long to expect to be incarcerated before they made any decision about JONES contacting "Dude."

39. The conversation continued, and EISENHOUR expressed his doubts about PRUETT's ability to handle EISENHOUR's business while EISENHOUR is incarcerated. EISENHOUR told JONES he planned on JONES getting "everything," but PRUETT took it instead. EISENHOUR felt PRUETT was taking advantage of the situation, and JONES agreed.

40. JONES then told EISENHOUR, "I got you dog. I wasn't going to give it to him, and I wasn't going to give it to nobody until I talked to you." JONES later said, "The money will be where I work. You know what I mean? In the safe." EISENHOUR says, "I know you got me."

41. On January 24, 2017, I submitted an administrative subpoena to the Sprint Corporation asking for current subscriber information and tolls for the Target Telephone. The subscriber information was the same, and the Target Telephone was still active as of January 24, 2017.

42. On January 27, 2017, I requested that the MDOC send me the record of any phone calls made to the Target Telephone from anyone within the MDOC. On that same day, I was provided a phone call between the Target Telephone and the phone account of Richard BUCKNER. I recognized JONES' voice from the previous phone calls. During the call, JONES said that he was on his way to Monett. This call showed that the Target Telephone was active and being used by JONES on January 27, 2017.

43. Based on the above investigation, there is probable cause to believe that JONES and others, known and unknown, are involved in the ongoing commission of violations of Title 21, United States Code, Sections 846 and 841(a)(1), that is distribution of controlled substances,

12

possession with the intent to distribute controlled substances, and conspiracy to distribute controlled substances, and that he and/or others known and unknown are utilizing the Target Telephone to facilitate that activity.

44. In my experience, the general location of the Target Telephone, gathered from cell site/sector location, GPS location, or other means, can yield evidence that is relevant and material to an ongoing criminal investigation of the specified offenses. Such information includes leads relating to: (1) the geographic breadth of the suspected drug trafficking cell, (2) the transportation routes and means for trafficking narcotics and drug proceeds from one geographic area to another, (3) other geographic locations where a drug organization may be engaging in similar conduct, (4) the geographic location of "stash" houses, and (5) the geographic locations where meetings are held to exchange narcotics and money. Further, the geographic location of the Target Telephone can be used to corroborate the observations of surveillance agents. Surveillance agents can compare observations of the user of the Target Telephone with geographic information in order to verify the identification and location of the user of the Target Telephone.

45. In light of the nature of this affidavit and in order to keep from compromising the on-going nature of this investigation, I request that it be sealed and that service of the order granting

authorization for tracking the Target Telephone be delayed for 30 days following termination of the period of tracking.

Further your affiant sayeth naught.

*[signature]*
Jason R. Carter
Task Force Officer
Drug Enforcement Administration

Subscribed and Sworn to me, this __1st__ day of February, 2017, in the Western District of Missouri.

*[signature]*
Honorable David P. Rush
United States Magistrate Judge
Western District of Missouri